UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------X

In re:                                              :

                                                    :        Chapter 7

ALFRED PLACERES,                                    :        Case No.: 15-10691 (SMB)

                                                    :

                            Debtor.                 :

------------------------------------------------X

JOSE BORGES,                                        :

                                                    :

                            Plaintiff,              :

                                                    :

        — against —                                 :        Adv. Pro. No.: 15-01356 (SMB)

                                                    :

ALFRED PLACERES,                                    :

                                                    :

                            Defendant.              :

------------------------------------------------X

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

Law Office of Paul O'Dwyer, P.C.
*Attorney for Plaintiff*
134 West 26th Street, Suite 902
New York, New York 10001

        Paul O'Dwyer, Esq.
            Of Counsel

MARIA M. MALAVE, ESQ.[1]
Attorney for Defendant
124 West 227th Street
Bronx, New York 10463

        Maria M. Malave, Esq.
            Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

---

[1]      The debtor, an attorney, discharged Ms. Malave after trial and submitted his post-trial proposed findings of fact and conclusions of law *pro se.*

The plaintiff Jose Borges ("Borges") filed this adversary proceeding seeking a determination that the debt owed by the debtor Alfred Placeres ("Placeres") was not dischargeable under 11 U.S.C. § 523(a) and Placeres was not entitled to a discharge under 11 U.S.C. § 727. The Court conducted a trial on July 12, 2017, at which it heard the testimony of both parties and received numerous documents in evidence. The Court concludes that Borges failed to sustain his burden of proof under Bankruptcy Code § 523(a), but demonstrated that the Debtor was not entitled to a discharge under Bankruptcy Code § 727(a)(4)(A). Accordingly, the Debtor's discharge is denied.

## BACKGROUND

### A.     The Immigration Proceedings

Borges, a native of Venezuela, came to the United States in 1996. In 1997, he was placed in removal proceedings in the Immigration Court in Newark, New Jersey to answer a charge that he had overstayed the terms of his visa and was removable to Venezuela. (*Stipulated Facts* at ¶ 1.)[2] He appeared *pro se* at three separate hearings in August, September and December 1997, and was granted adjournments because he was unrepresented. (*Stipulated Facts* at ¶ 2.) After the December 1997 hearing, and upon the Immigration Court judge's express direction, Borges sought counsel to represent him at the next hearing scheduled for January 27, 1998 (the "January Hearing"). (*Stipulated Facts* at ¶ 3.)

---

[2]      The *Stipulated Facts* appear in Section III of the *Joint Pre-Trial Order*, dated July 17, 2017 (ECF Doc. # 39.) In this opinion, "ECF Doc. #" refers to the electronic docket in this adversary proceeding, and "ECF Main Case Doc. #" refers to the electronic docket in the main bankruptcy case.

On or about January 14, 1998, Borges met Adela Ivan ("Ivan") of Entra America who claimed to be Placeres' paralegal.  At the time, Borges was about to marry Jolie LaMarca, a U.S. citizen, and was eligible to apply for relief from removal from the United States based on the marriage.  (*See Stipulated Facts* at ¶ 5.)  Ivan told Borges that Placeres would represent him in the proceedings in the Immigration Court and before the Immigration and Naturalization Service ("INS"), (*Stipulated Facts* at ¶ 4), and Placeres subsequently filed a Notice of Appearance with the Immigration Court stating that he was Borges' attorney.  (*Stipulated Facts* at ¶ 8.)

Prior to the January Hearing, Ivan informed Borges that Placeres would not appear with him at the Immigration Court.  She provided Borges with a motion to change venue to the Immigration Court in New York (the "Venue Motion"), and instructed him to present it to the Immigration Court judge at the January Hearing. (*Stipulated Facts* at ¶ 9.)  Borges appeared *pro se* at the January Hearing, (*Stipulated Facts* at ¶ 10*), armed with a copy of Placeres' Notice of Appearance and the Venue Motion.  (*Stipulated Facts* at ¶ 11.)  The Immigration judge became angry that Borges appeared without his lawyer, he denied the Venue Motion, *and warned Borges that if he did not show up with his lawyer at the next hearing he would be deported*. (Transcript of Hr'g held July 12, 2017 ("Tr.") at 16:17-23.)

Two days later, Borges married LaMarca, and went to Entra America on January 31, 1998 to sign all of the forms for the adjustment of his status application.  (Tr. at 19:23-20:11)  Applications and petitions for permanent residence were prepared by Placeres and signed by Borges and LaMarca, (*see* Plaintiff's Exhibit ("PX") 4, 5;

*Stipulated Facts* at ¶ 23), but Placeres never met or spoke with either one.  (*Stipulated Facts* at ¶ 6.)

It was at or about this time that Ivan gave Borges the instructions that would prove fatal.  Passing along instructions she had supposedly received from Placeres, Ivan told Borges that he did not have to attend his February 3, 1998 court hearing (the "February Hearing") because his green card application would be filed by then and it was unnecessary for him to appear.  (*Stipulated Facts* at ¶ 13.)  Borges called Entra America on the date of the February Hearing to confirm that all of the paper work had been filed and he did not have to appear, and was told everything had been taken care of and he did not have to show up.  (Tr. at 21:8-14.)  Pursuant to Ivan's instructions, Borges did not attend the Immigration Court hearing, and as a result, the Immigration judge ordered Borges deported *in absentia* (the "Deportation Order").  (*Stipulated Facts* at ¶ 14.)

Borges was unaware of the Deportation Order until he received notice from the INS in April 1998, instructing him to appear at an INS office for deportation to Venezuela.  (*Stipulated Facts* at ¶ 15.)  Placeres did not meet with Borges or ask him why he failed to attend the February Hearing, (*Stipulated Facts* at ¶ 17), but that same month, he filed a "Motion to Reopen to Reconsider" (the "First Motion to Reopen").  (*Stipulated Facts* at ¶ 18; PX 7.)  The First Motion to Reopen did not provide any explanation for Borges' failure to attend the February Hearing or ask Immigration Court to vacate the Deportation Order.  (*Stipulated Facts* at ¶ 19.)  Instead, it asked the Immigration Court to stay the Deportation Order, grant the Venue Motion and permit Borges to proceed with his case in the transferee Immigration Court.  (PX 7, at 2.)

4

The First Motion to Reopen was ill-advised and certain to lose. Under the applicable regulations only one motion to reopen an *in absentia* order was allowed, it had to be filed within 90 days of the order in question, and had to show either lack of notice or exceptional circumstances excusing the person's failure to attend the scheduled hearing. (*Stipulated Facts* at ¶ 20.) Although the First Motion to Reopen was timely, it did not allege lack of notice or exceptional circumstances. Placeres testified that he was unaware of any exceptional circumstances at the time because he didn't know (or ask) why Borges failed to attend the February Hearing. (Tr. at 83:17-84:21.) His testimony is credible on this point only because it typifies the negligence that characterized his representation of Borges. Not surprisingly, the First Motion to Reopen was denied because Borges failed to allege lack of notice or exceptional circumstances. (PX 8.) Ivan nevertheless informed Borges that the motion had been granted. (Tr. at 24:23-24.)

Although the Venue Motion had been denied and Borges' case was still pending in Newark, Borges' application for permanent residence and related petitions were filed with INS in New York. Borges and his wife attended an interview at INS in connection with his permanent residence status represented by another attorney, Jamal Jbara, Esq. Unaware of the Deportation Order, the INS officer in New York told Borges his application for permanent residence status had been approved, stamped Borges' passport to reflect that approval and advised Borges that he would receive his green card in the mail. (Tr. at 25:25-26:16.)

By April 2000, Borges had still not received his green card. He planned to return to Venezuela to visit his ailing mother, and contacted Entra America to make sure he

would be able to reenter the United States.  Ivan advised him not to travel because the

order of deportation had not been vacated.  (Tr. at 26:18-25.)  This contradicted the

earlier information he had received that the Deportation Order had been vacated, but

Ivan assured him everything was being taken care of.  (Tr. at 27:5-13.)  Borges then

returned to the INS office in New York to rectify an error in certain forms, and the INS

officer told Borges that he was transferring his case to New Jersey and voiding the

adjustment of status previously stamped into his passport "without prejudice."  (Tr. at

27:24-28:15.)

Between then and 2002, nothing happened with Borges' immigration case.  (Tr.

28:16-18.)  In 2002, Borges changed lawyers, (Tr. at 28:21-22), and in early 2003, filed a

second motion to reopen the Deportation Order with the Immigration Court (the

"Second Motion to Reopen"), alleging ineffective assistance and fraud by Placeres as the

reason he did not attend the February Hearing.  (*Stipulated Facts* at ¶ 31.)  The

Immigration Court denied the motion, and the Board of Immigration Appeals ("BIA")

affirmed in March 2004.  (*Stipulated Facts* at ¶ 42; PX 14.)

## B.    The Arrest and Subsequent Immigration Proceedings

In February 2004, Borges was arrested at his home by the Department of

Homeland Security ("DHS") and detained for deportation to Venezuela.  (*Stipulated

Facts* at ¶ 39.)  During his confinement, he suffered a nervous breakdown, was placed in

a secure psychiatric hospital for approximately four months and twice attempted

suicide.  (*Stipulated Facts* at ¶ 40.)  Following his discharge from the psychiatric

hospital, Borges remained in DHS custody.  (*Stipulated Facts* at ¶ 41.)

Borges appealed that denial of the Second Motion to Reopen to the Third Circuit
Court of Appeals.  The Court issued a stay of removal in April 2004, (*Stipulated Facts* at
¶ 43), but Borges continued to be held by DHS.  Nearly one year later, in March 2005,
the Third Circuit granted his motion and appeal, remanded the case back to the BIA
with an instruction to consider his arguments regarding fraud along with newly-filed
evidence, and held that "[i]If the BIA finds fraud and finds that, by virtue of equitable
tolling, the motion to reopen was timely filed, it is instructed to vacate the in absentia
order of removal so that Borges can apply for adjustment of status." (*Stipulated Facts* at
¶ 49; *Borges v. Gonzalez*, 402 F.3d 398 (3d Cir. 2005).)  Upon remand, the Deportation
Order was vacated, and Borges's application for adjustment of status was approved.
(*Stipulated Facts* at ¶ 50.)  He was released from DHS custody in April 2005 after
fourteen months in confinement.  (*Stipulated Facts* at ¶ 51.)

## C.    The Disciplinary Proceedings Against Placeres

In connection with the Second Motion to Reopen, Borges filed a complaint
against Placeres on January 8, 2003 with the Disciplinary Committee of the Appellate
Division of the Supreme Court of the State of New York, First Judicial Department.
(*Stipulated Facts* at ¶ 32.)  The Disciplinary Committee complaint alleged that Borges
never met with Placeres, Ivan did all of the work on his case, Ivan forged Placeres'
signature on all of his immigration forms and Immigration Court papers with Placeres'
knowledge and consent, the address on all of the immigration papers was a PO Box
address which was not Placeres' office address, Ivan, claiming to be relaying advice from
Placeres, had instructed Borges not to attend the February Hearing, and at the time in

question, Borges was eligible for relief from removal based on his marriage to a U.S. citizen.  (*Stipulated Facts* at ¶ 33; *see* PX 9.)

Although Placeres had never spoken to Borges, he challenged Borges' version of the events.  Placeres responded to the Disciplinary Committee complaint, stating that Borges' allegations were untrue, he (Placeres) had done the work on Borges' immigration case, it would have been illogical for him or Ivan to instruct Borges not to attend the removal hearing because his absence would necessarily lead to an *in absentia* order, Borges did not attend the Immigration Court hearing because he did not want to take time off from work, the postal box address listed on the papers filed with INS was his (Placeres') and had been his since the 1980s because of problems with receiving mail at his office address, and he withdrew from representing Borges because he believed his marriage was fraudulent.  (*Stipulated Facts* at ¶ 34; PX 10.)  Along with his response to the Disciplinary Committee complaint, Placeres also submitted various documents and receipts which purported to confirm his involvement in the case and otherwise corroborate his response.  (*Stipulated Facts* at ¶ 35.)  As required by the applicable law, Borges submitted Placeres' response to the Immigration Court which was deciding the Second Motion to Reopen.  (*Stipulated Facts* at ¶ 37.)[3]

Following the completion of the civil proceedings described immediately below, the Disciplinary Committee issued a formal admonition to Placeres on August 21, 2015. It found that Placeres' failure to attend Borges' immigration court hearing, and his

---

[3]      Under *In re Lozado*, 19 I. & N. Dec. 637, 639 (BIA 1988), *aff'd*, 857 F.2d 10 (1st Cir. 1988), a person who moves to reopen an *in absentia* deportation order based upon ineffective assistance of counsel must, *inter alia*, detail the circumstances, inform former counsel of the allegations and submit any subsequent response with the motion.

submission to the Committee of "an incomplete or inaccurate representation of Plaintiff's file," was conduct that adversely reflected on his fitness as a lawyer. (*Stipulated Facts* at ¶ 70; PX 23.)

### D.    The Malpractice Action

On August 4, 2003, Borges commenced a civil action in New York State Supreme Court against Placeres, Ivan and Jbarra, alleging liability under numerous theories, including, legal malpractice. (*Stipulated Facts* at ¶ 38.)  The action was dismissed against Ivan, settled by Jbarra, and went to trial against Placeres in February and March 2012. (*Stipulated Facts* at ¶ 52.)  José Luis Torres, Esq. was counsel of record for Placeres, (*Stipulated Facts* at ¶ 53; PX 15), but Torres did not actually conduct the trial. Instead, Brian Robinson, Esq. tried the case, appearing for Placeres each day as "of counsel to José Luis Torres." (*Stipulated Facts* at ¶ 54; Tr. at 93:6-12.)  Robinson never filed a notice of appearance. (Tr. at 93:13-17.)

The trial judge in the malpractice action *sua sponte* dismissed Borges' claims for negligence, breach of contract, negligent supervision, intentional and negligent infliction of emotional distress, breach of fiduciary duty, and fraud as duplicative of his legal malpractice claim. (*Stipulated Facts* at ¶ 55.)  After trial, the jury found Placeres liable based on three acts of legal malpractice.  First, Placeres, *through Ivan*, negligently advised Borges not to attend the February Hearing.  There was no finding that Placeres gave this advice directly to Borges.  Second, Placeres negligently failed to attend the February Hearing.  Third, Placeres negligently failed to allege adequate and sufficient

grounds on the First Motion to Reopen to reconsider the Deportation Order.[4]  (PX 19.)

Judgment was entered against Placeres in the sum of $1,250,206.00 which remains

unpaid.  (*Stipulated Facts* at ¶¶ 56, 57, 64.)  The judgment included $900,000 for

emotional damages that Borges suffered as a result of his detention and incarceration by

DHS, and the remainder ($294,500) compensated Borges for his loss of income and

legal fees.  (*Stipulated Facts* at ¶ 58.)  Post-trial motions to set aside the verdict were

filed by Torres, (PX 20), and were denied.  (*Stipulated Facts* at ¶ 59.)

Placeres appealed the judgment to the Supreme Court, Appellate Term, arguing

*inter alia*, that an award of nonpecuniary damages (here, the $900,000 for pain and

suffering) was not recoverable in an action for legal malpractice.  *See Wolkstein v.

Morgenstern*, 713 N.Y.S.2d 171, 173 (N.Y. App. Div. 2000) ("A cause of action for legal

malpractice does not afford recovery for any item of damages other than pecuniary loss

so there can be no recovery for emotional or psychological injury.").  The Appellate

Term affirmed the judgment, ruling that Placeres' failure to object to the jury charge on

pain and suffering, the corresponding question in the verdict sheet and the trial

evidence regarding pain and suffering constituted his consent to the jury charge as the

law to be applied.  *Borges v. Placeres*, 986 N.Y.S.2d 298, 300 (N.Y. App. T. 2014).

Placeres appealed to the Appellate Division which also affirmed, concluding that

Placeres had failed to preserve the argument that Borges could not recover

nonpecuniary damages in a legal malpractice action.  *Borges v. Placeres*, 2 N.Y.S.3d 75,

76 (N.Y. App. Div. 2014).  Placeres' motion for leave to appeal to the Court of Appeals

---

[4]    In fact, the First Motion to Reopen did not ask the Immigration Court to reconsider the
Deportation Order.

was denied on June 30, 2015. (*Stipulated Facts* at ¶ 63; PX 22.) Torres represented
defendant on the appeals to the Appellate Term and the Appellate Division, and also on
a motion for leave to appeal to the Court of Appeals. (*Stipulated Facts* at ¶ 62.)

**E.    The Bankruptcy**

Placeres filed this chapter 7 case on March 23, 2015. (*Stipulated Facts* at ¶ 65.)
His schedules listed income of only $2,100 per month, and expenses of $2,800 per
month, and personal property valued at $4,226, no real property, and liabilities of
$1,292,832.00. (*Stipulated Facts* at ¶ 66.) Although the Appellate Term and the
Appellate Division had already concluded that Placeres forfeited his objection to the
$900,000 award for pain and suffering based on his counsel's failure to object at trial,
Placeres did not schedule a malpractice claim.

On August 27, 2015, the chapter 7 trustee filed a report of no distribution,
signaling that the estate was fully administered and there were no assets to administer
for the benefit of creditors. In February 2016, the Borges filed a motion to compel the
chapter 7 trustee to abandon Placeres' malpractice claim to him so that he could pursue
it on his own behalf. (*Notice of Motion by Plaintiff for an Order Compelling Trustee to
Abandon Debtor's Cause of Action Against His Former Counsel and for Leave to
Plaintiff to Pursue Same*, dated Jan. 22, 2016 (ECF Main Case Doc. # 29).) The Court
granted the abandonment motion over the objections of the chapter 7 trustee and
Placeres, but ordered the abandonment to Placeres rather than to Borges. (*Order
Directing Abandonment of Property*, dated Mar. 24, 2016 (ECF Main Case Doc. # 36).)

That same day, Placeres amended his schedules to list as an asset, for the first time, a cause of action for malpractice against his former attorneys. The amendment valued the claim at $1, and Placeres stated in an attached declaration that he did not believe he had a viable cause of action against his former attorneys, but that he amended his schedule because the potential claim was abandoned to Placeres by order of this Court. (*Stipulated Facts* at ¶¶ 72, 73.) The attached declaration did not explain why Placeres believed the cause of action against his former attorneys was not viable. (*Stipulated Facts* at ¶ 74.)

Borges commenced this Adversary Proceeding on October 13, 2015. (*Stipulated Facts* at ¶ 71; *see Complaint*, dated Oct. 13, 2015 (ECF Doc. # 1).) The *Complaint* sought dismissal of the chapter 7 petition under 11 U.S.C. § 707 (Count I), a determination that Placeres' debt to Borges was not dischargeable under 11 U.S.C. § 523(a)(4), (a)(6) and (a)(7) (Counts II, III and V, respectively), and objected to Placeres' general discharge under 11 U.S.C. § 727(a) (Count IV). After hearing cross motions for summary judgment, the Court dismissed Count I from the bench, reserved decision on Count II, denied summary judgment on Counts III and IV, and Borges agreed that Count V should be dismissed. *Borges v. Placeres*, 561 B.R. 354, 362 (Bankr. S.D.N.Y. 2016).[5] The Court subsequently granted partial summary judgment dismissing Count II, *id.* at 364, leaving only Counts III and IV to be resolved at trial.

At the conclusion of the trial, the Court dismissed the objections to discharge under Bankruptcy Code § 727(a)(12), (Tr. at 103:4-4), and § 727(a)(3), (Tr. at 107:5-10),

---

[5]    The Court's decision incorrectly stated that the Court had denied summary judgment on Counts II and IV. As stated in the text, the Court denied summary judgment on Counts III and IV.

and invited briefing on whether Borges had sustained his burden of proof under §
727(a)(5). (Tr. at 106:15-17.) Neither side briefed this issue, and I consider it
abandoned. Accordingly, the only remaining claims involve a determination whether
the Placeres' debt to Borges is not dischargeable because it resulted from a willful and
malicious injury, 11 U.S.C. § 523(a)(6), and whether Placeres should be denied a general
discharge based on his knowing, fraudulent statements and omissions in his schedules
and at his § 341 meeting regarding a malpractice claim against his state court attorneys.
*See* 11 U.S.C. § 727(a)(4)(A).

## DISCUSSION

As the jury found, Borges suffered grievously as a result of Placeres' legal
malpractice. He spent fourteen months confined by the immigration authorities, and
twice attempted suicide. But however deplorable Placeres' representation and Borges'
suffering, Borges must prove for the purposes of this adversary proceeding that Placeres
engaged in conduct targeted by the Bankruptcy Code as a basis to deny the discharge of
a his debt to Borges or the discharge of all of debts. In this regard, "[e]xceptions to
dischargeability are 'narrowly construed against the creditor's objections, and confined
to those plainly expressed in the [Bankruptcy] Code.'" *Bethpage Fed. Credit Union v.
Furio* (*In re Furio*), 77 F.3d 622, 624 (2d Cir. 1996) (quoting *Household Finance Corp.
v. Howard (In re Howard),* 73 B.R. 694, 700 (Bankr. N.D. Ind. 1987)); *accord Bullock
v. BankChampain, N.A.*, 569 U.S. 267, 275 (2013); *Kawaauhau v. Geiger,* 523 U.S. 57,
62 (1998); *Gleason v. Thaw,* 236 U.S. 558, 562 (1915). Objections to discharge are also
narrowly construed for the same reason. *Warchol v. Barry,* (*In re Barry*), 451 B.R. 654,
659 (B.A.P. 1st Cir. 2011) ("Objections to discharge should be 'narrowly construed in

13

furtherance of the Bankruptcy Code's fresh start policy and the claimant must show that its claim comes squarely within an objection enumerated in Bankruptcy Code § 727[].'") (quoting *Annino, Draper & Moore, P.C. v. Lang (In re Lang),* 246 B.R. 463, 468 (Bankr. D. Mass.), *aff'd,* 256 B.R. 539 (1st Cir. BAP 2000)).  The creditor asserting the non-dischargeability of a debt bears the burden of proof by a preponderance of the evidence, *Grogan v. Garner,* 498 U.S. 279, 286-87 (1991), and the person objecting to the debtor's general discharge must also prove the objection by a preponderance of the evidence. *Nisselson v. Wolfson* (*In re Wolfson*), 152 B.R. 830, 832 (S.D.N.Y. 1993).

## A.    Count III - Bankruptcy Code § 523(a)(6)

Bankruptcy Code § 523(a)(6) provides that the bankruptcy discharge under 11 U.S.C. § 727 does not discharge a debt "for willful and malicious injury by the debtor to another entity . . . ."  The party asserting that the debtor acted willfully must prove that the debtor deliberately intended to injure the plaintiff and not merely that he committed an intentional act that unintentionally inflicted the injury.  *See Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).  A person intends to injure another when he "desires to cause consequences of his act, or . . . he believes that the consequences are substantially certain to result from it."  RESTATEMENT (SECOND) OF TORTS § 8A (1965).  The "willfulness" test is subjective; the plaintiff must demonstrate that the debtor harbored the required intent and not that a reasonable person would be deemed to have intended the injury that ensued.  *Hough v. Margulies* (*In re Margulies*), 517 B.R. 441, 453 (S.D.N.Y. 2014).  Neither negligent nor reckless conduct will support a non-dischargeability claim under § 523(a)(6).  *Kawaauhau*, 523 U.S. at 64.

14

In order to establish malice, plaintiff must prove that the debtor acted wrongfully and "without just cause or excuse, even in the absence of personal hatred, spite or ill will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 87 (2d Cir. 1996); *accord Ball*, 451 F.3d at 69.  Malice is implied when "anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another."  *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 167 B.R. 29, 33 (Bankr. S.D.N.Y. 1994) (internal quotation marks omitted), *aff'd*, 94 F.3d 84 (2d Cir. 1996).

Borges relies on three distinct acts that he argues caused a willful and malicious injury:  (1) Ivan's instruction not to attend the February Hearing, which resulted in the Deportation Order, (2) the filing of the deficient First Motion to Reopen and (3) the untrue statements Placeres made to the Disciplinary Committee that resulted in the denial of the Second Motion to Reopen.  (*Plaintiff's Proposed Findings of Facts and Conclusions of Law*, dated Aug. 23, 2017, at 19-20 ("*Plaintiff's PFF*")(ECF Doc. # 43).)

### 1.    Ivan's Instruction

The state court jury' found that Ivan instructed Borges not to attend the February Hearing.  Nevertheless, there was no jury finding or evidence in this proceeding that Placeres told Borges not to attend the February Hearing, instructed Ivan to tell Borges not to attend the February Hearing or knew prior to the February Hearing that Ivan had instructed Borges not to appear.[6]  Thus, Borges failed to prove that Placeres had the

---

[6]    Borges argues that "[t]here was no testimony, either in this case or in the civil action, to the effect that Defendant did not direct Ivan to instruct Plaintiff not to attend the court hearing."  *Plaintiff's Response to Defendant's Proposed Findings of Facts and Conclusions of Law*, dated Oct. 6, 2017, at 4 (ECF Doc. # 50.)  This misstates the record.  Placeres testified that he could not identify exceptional circumstances in connection with the First Motion to Reopen because he was not aware that Ivan had told

subjective intent required for a finding of willfulness, unless, as Borges argues, Ivan's intent can be imputed to Placeres.

Section 523(a)(6) requires a willful and malicious injury *by the debtor*, and it is well-settled that willfulness cannot be based on the imputation of another person's actions or intent. *E.g., Mothershead v. Bacchus* (*In re Bacchus*), Adv. No. 10–1017, 2010 WL 3909697, at *4 (Bankr. M.D. Ga. Sept. 29, 2010); *Contini v. Cook* (*In re Cook*), Adv. No. 07–50072–mcr, 2009 WL 2872864, at *5-6 (Bankr. N.D.N.Y. Apr. 7, 2009); *Yash Raj Films (USA), Inc. v. Akhtar* (*In re Akhtar*), 368 B.R. 120, 133 (Bankr. E.D.N.Y. 2007); *Colombia Farms Distrib., Inc. v. Maltais* (*In re Maltais*), 202 B.R. 807, 813 (Bankr. D. Mass. 1996); *Giuliano v. Albano (In re Albano),* 143 B.R. 323, 325 (Bankr. D. Conn. 1992); *see Cowin v. Countrywide Home Loans, Inc.* (*In re Cowin*), 864 F.3d 344, 351 n. 4 (5th Cir. 2017) ("[T]he plain language of § 523(a)(6) explicitly requires action 'by the debtor.' Consistent with this reading, several courts have interpreted 523(a)(6) to require that the debtor have acted personally to inflict the willful and malicious injury.") Borges concedes this rule, (*Plaintiff's PFF* at 23) (quoting *Cook*, 2009 WL 2872864, at *5), but argues that it does not apply where there is "some evidence that [the debtor] was personally involved." (*See Plaintiff's PFF* at 23-25.)

Borges' "exception" merely restates the rule; section 523(a)(6) requires an injury "by the debtor," and the debtor's "personal involvement" will satisfy the first prong of §

---

Borges not attend the February Hearing. (Tr. at 84:24-85:6; 85:7-11.) This implies that he did not tell Ivan to tell Borges not to attend the February Hearing. Further, the jury did not find that Placeres told Ivan to instruct Borges to skip the February Hearing. Borges also ignores his burden of proof. He had to prove that Placeres caused a willful and malicious injury; Placeres was not obligated to disprove Borges' claim.

523(a)(6) provided his "personal involvement" caused a willful and malicious injury.  As

noted, Borges failed to show that Placeres was personally involved in or knew of Ivan's

instruction to the Borges not to attend the February Hearing.  Hence, he was not

"personally involved" in the act alleged to have caused the injury.

Furthermore, the decisions Borges cites in this part of his post-trial submission

are distinguishable.  They deal with a different exception to discharge, 11 U.S.C. §

523(a)(2)(A), or in the case of *In re Lovich*, 117 F.2d 612 (2d Cir. 1941), the predecessor

to that subsection under the former Bankruptcy Act.  Section 523(a)(2)(A) excepts from

discharge debts "for money . . . obtained by [fraud]," and the acts of an agent will be

imputed to the debtor principal (or fellow general partner) for purposes of this

exception to dischargeability if the debtor knew *or should have known* of the agent's

fraudulent conduct or was recklessly indifferent to it.  *Citizens State Bank of Maryville,*

*Missouri v. Walker* (*In re Walker*), 726 F.2d 452, 454 (8th Cir. 1984); *see Lovich*, 117

F.2d at 615 ("[W]hen a false statement is made by an agent, some additional facts must

exist justifying an inference that the bankrupt knew of the statement and in some way

acquiesced in it or failed to investigate its accuracy."); *Sachan v. Huh* (*In re Huh*), 506

B.R. 257, 271-72 (B.A.P. 9th Cir. 2014) (ruling that the agent's fraud cannot be imputed

to the principal unless the debtor knew or should have known of the agent's fraud);

*Helena Chem. Co. v. Simmons* (*In re Simmons*), 364 B.R. 673, 678 (Bankr. E.D. Mo.

2007) ("Where a partner participates in, condones, or otherwise knew of, or should have

known of, fraud, he should not be able to discharge any resulting debt under §

523(a)(2)(A).")

Under § 523(a)(2)(A), the disqualifying act does not have to be committed *by the debtor*, but under § 523(a)(6), the debt must arise from the "willful and malicious injury by the debtor." As the earlier cited authorities explained, this distinction is the reason why courts uniformly reject the imputation of intent. *E.g., Cowin,* 864 F.3d at 351 n. 4; *Cook*, 2009 WL 2872864, at *5 (citing cases). In addition, the courts interpreting § 523(a)(2)(A) impute liability where the debtor "knew or should have known" of the agent's fraud, and "should have known" imposes an objective standard contrary to the subjective standard discussed earlier.

Even if the imputation standards under § 523(a)(2)(A) applied to Borges' claim under § 523(a)(6), Borges failed to prove that Ivan's intent should be imputed to Placeres. *In re Huh*, cited by Borges, is directly on point. There, the debtor (Huh), a real estate broker, employed or was affiliated with Kim, who he trained and generally supervised. 506 B.R. at 259. Huh's brokerage represented Sachan in a transaction involving the purchase of a business. Sachan dealt solely with Kim who handled the representation, although Huh had signed a standard disclosure form that Kim gave to Sachan. *See id.* at 259-60. Kim induced Sachan to purchase the business through fraudulent misrepresentations, Sachan sued in state court and recovered an approximate $1 million judgment, inclusive of interest, against Huh and Kim. *Id.* at 260-61.

Huh subsequently filed for bankruptcy, and Sachan commenced an adversary proceeding seeking a determination that his judgment against Huh was not dischargeable under Bankruptcy Code § 523(a)(2)(A). Applying the standard for imputation in cases under § 523(a)(2)(A), *see id.* at 271-72, the Bankruptcy Appellate

Panel affirmed the dismissal of the complaint because Sachan had failed to demonstrate any culpability on Huh's part. Huh never communicated with Sachan regarding the purchase, he never made any representations to Sachan regarding the specific transaction, and he was not even aware of the transaction or the subject business before the closing. *Id.* at 272.

The same material facts are present in this case. Placeres never dealt directly or spoke with Borges regarding his attendance at the February Hearing, and Borges failed to offer evidence that Placeres knew *prior to the February 3 hearing* that Ivan had instructed Borges not to appear. Accordingly, Borges failed to prove Placeres' willfulness with regard to Ivan's instruction to Borges not to attend the February Hearing, and it is unnecessary to consider the separate requirement of malice.

### 2.    The Effect of the Malpractice Action

According to Borges, Placeres agreed in the malpractice litigation that "he was responsible for Ivan's instruction to Plaintiff not to attend his Immigration Court hearing." (*Plaintiff's PFF* at 25.) As a result, Placeres is collaterally estopped from denying that he agreed to be responsible for Ivan's statements. (*Plaintiff's PFF* at 25-26.)

Even if Placeres conceded his vicarious liability for Ivan's erroneous instructions in the legal malpractice action, he can still assert his lack of willfulness here. Although Ivan's negligent conduct was imputable to Placeres in the legal malpractice action, it is not imputable to prove willfulness under § 523(a)(6). Moreover, Placeres' willfulness was neither relevant to the legal malpractice claim nor tried, and under *Kawaauhau*, a

judgment based on negligence or even recklessness is insufficient to satisfy the willfulness requirement under § 523(a)(6).  Thus, the fact that Placeres may have conceded that he was vicariously responsible for Ivan's negligence does not preclude him from arguing that he lacked the subjective intent to injure Borges.

Borges also contends that Placeres knew that Ivan was holding herself out as his paralegal, and giving legal advice and signing legal papers in his name, and "Defendant cannot deny that *he should not* [*sic*] *have known* that Ivan was giving incorrect advice to people, with catastrophic consequences." (*Plaintiff's PFF* at 27 (emphasis added).) For the reasons stated, the Court must examine the Placeres' subjective intent, and what Placeres *should have known* is irrelevant.

Finally, Borges argues that Placeres failed to investigate the allegation relating to the instruction once it was brought to his attention, and instead, lied about it, demeaned Borges, and tried to cover it up. (*Plaintiff's PFF* at 26.)  Placeres' conduct following his post-February 3 discovery regarding Ivan's instruction may have been improper and even reprehensible, but it does not imply anything about Placeres' intent prior to the February Hearing.

### 3.    The First Motion to Reopen

The Court dismissed this aspect of the § 523(a)(6) claim following closing argument on the grounds that it was a legal malpractice claim, and Borges had failed to prove that the motion was filed with the intent to injure Borges or with the substantial certainty that it would injure Borges. (Tr. at 117:7-119:4.)  Despite this ruling, Borges continues to argue in his post-trial submission that the filing of the Second Motion to Reopen caused a willful and malicious injury. (*Plaintiff's PFF* at 28-29.)

20

Borges contends, in substance, that Placeres made a motion that he knew he would lose and omitted arguments (Ivan's instruction not to appear) that would have led to a successful ruling on the motion. The evidence showed that Placeres failed to investigate the reason for Borges' non-appearance before he made the First Motion to Reopen, and Placeres testified credibly that he did not know about Ivan's instruction at that time. This was another unfortunate example of Placeres' negligent representation. But even if Placeres was substantially certain that the First Motion to Reopen would fail due to his negligence, Borges failed to show that Placeres acted with malice.

### 4.    The Disciplinary Committee Response

Placeres' response to the Disciplinary Committee raises a more difficult question. After Borges complained to the Disciplinary Committee, (PX 9), Placeres submitted a response, (PX 10), that impugned Borges and made several "false and injurious" statements. According to Borges, these included (1) Ivan never told Borges not to attend the February Hearing, (2) Borges elected not to attend the February Hearing because he didn't want to miss work and (3) Placeres withdrew from the representation because he believed he would encounter ethical problems if he presented Borges' marriage to the INS. (*Plaintiff's PFF* at 30.) His ethical concerns presumably stemmed from his belief that the marriage was fraudulent and was intended to circumvent the immigration laws. Borges argues that Placeres knew his response would be submitted to the Immigration Court that was deciding the Second Motion to Reopen, and "[t]hese statements were the basis for the denial of the [Second] Motion to Reopen" which led to his fourteen-month incarceration. (*Id.*) Placeres also submitted false documentation to the Disciplinary Committee. (*Id.*)

21

Although Placeres had the right to defend himself against Borges' complaint, he did not have a license to lie. His statement that he terminated his representation of Borges over ethical concerns about the marriage was as incredible then as now. Placeres knew of the impending marriage when he agreed, despite his busy schedule, to represent Borges and also knew that Borges and LaMarca would not be married by the time of the January Hearing. (Tr. at 63:10-64:3.) He testified that he devised a strategy of delay, including the preparation of the hopeless Venue Motion, to give them time to marry so that Borges could then apply for a change of status. (Tr. at 64:4-11; 65:6-9; 78:15-79:9.) After they were married, Placeres signed the applications by Borges and LaMarca to change Borges' status to permanent residence based on the marriage, (PX 4, 5), and submitted the applications to INS. Obviously, his ethical concerns over the marriage did not stop Placeres from agreeing to represent Borges despite his busy schedule, devising a strategy to delay so that Borges and LaMarca could marry and asserting to INS that the marriage was a basis to grant Borges permanent residence status. The only plausible explanation for why his representation ended was that the First Motion to Reopen had been denied, his strategy had failed to prevent Borges' deportation and there was nothing left to do.

Furthermore, Placeres could not truthfully state that Borges failed to attend the February Hearing because he did not want to miss work. Placeres never investigated the reason for Borges' non-appearance and did not know why he had failed to appear. Placeres statement was also incredible in light of Borges' testimony. Borges was sufficiently concerned about the consequences of failing to appear that he called Ivan

the day of the February Hearing to confirm that he did not have to.  He never expressed a concern about skipping work, especially for something so important.

Nevertheless, Borges failed to prove that the specific misstatements he identified in Placeres' response caused the denial of the Second Motion to Reopen.  The Immigration Court denied the Second Motion to Reopen solely on procedural grounds, (*see* PX 14, at 1), and the BIA affirmed primarily for the same reasons: the Second Motion to Reopen was not filed within 180 days of the Deportation Order as required by law, and Borges failed to comply with the procedural requirements of *Lozado*.  (*Id.*, at 2.)  In addition, although Borges claimed he failed to attend the February Hearing due to the incorrect statements by an individual in Placeres' office, he admitted that he was informed of the February Hearing date and knew he had to attend.  (*See id.*)  In other words, the incorrect advice did not shield Borges from the consequences of failing to attend the February Hearing after he had been warned of those consequences at the January Hearing.  (*Id.*)

The BIA did address Borges' disciplinary complaint and Placeres' response, stating that Placeres' "affidavit"[7] had the "ring of truth."  (*Id.*)  However, it did not rely on the statements identified by Borges as injurious and false.  Instead, the "ring of truth" emanated from Placeres' statements that *he* never told his employee (presumably Ivan) to tell Borges not to appear at the February Hearing, and his convincing argument

---

[7]    I assume the "affidavit" referred to Placeres' unsworn response submitted to the Disciplinary Committee.

(referring to PX 10, at 4) that it would have been illogical for him or Ivan to have told Borges not to appear at the February Hearing.

Borges failed to show that these statements were false. As noted, there is no evidence that Placeres told Ivan to tell Borges not to attend the February Hearing or that Placeres knew prior to the February Hearing that Ivan gave Borges that advice. That a state court jury found nine years later that Ivan gave Borges this advice does not undercut Placeres' subjective belief in 2003 that she did not. Furthermore, although his belief was the product of his own malpractice, it does not make his statement a knowing, fraudulent lie. Moreover, Placeres' statement that it would have been illogical to advise Borges not to attend the February Hearing is undisputed – Borges makes the same argument. (*Plaintiff's PFF* at 21 ("Defendant thus knew that the deportation order was a substantially certain result (in fact it was inevitable) from the instruction to Plaintiff to attend his Immigration Court hearing.").) Thus, even if Placeres' submission to the Disciplinary Committee contained lies, the only statements that the BIA credited were truthful or not knowingly false when made, and do not support a finding of malice.

Borges also failed to prove willfulness. Even if Placeres knew that his response would be provided to the Immigration Court, Borges failed to show that Placeres intended or was substantially certain that it would injure Borges. In fact, there is no evidence that the Immigration Court credited it.

Accordingly, Count III is dismissed.

## B.   Count IV – Bankruptcy Code § 727(a)(4)(a)

Bankruptcy Code § 727(a)(4)(A) mandates the denial of a discharge to the debtor who knowingly makes a material, false statement with fraudulent intent.[8]  *Dubrowsky v. Perlbinder* (*In re Dubrowsky*), 244 B.R. 560, 572 (E.D.N.Y. 2000); *Nof v. Gannon* (*In re Gannon*), 173 B.R. 313, 319 (Bankr. S.D.N.Y. 1994); *Zitwer v. Kelly* (*In re Kelly*), 135 B.R. 459, 461 (Bankr. S.D.N.Y. 1992).  The plaintiff must establish by a preponderance of the evidence that the debtor (1) made a statement under oath, (2) the statement was false, (3) the debtor knew the statement was false, (4) the debtor made the statement with fraudulent intent, and (5) the statement related materially to the bankruptcy case.  *Moreo v. Rossi* (*In re Moreo*), 437 B.R. 40, 59 (E.D.N.Y. 2010); *Vidomlanski v. Gabor* (*In re Gabor*), Adv. Proc. No. 06-1916, 2009 WL 3233907, at *7 (Bankr. S.D.N.Y. Oct. 8, 2009); *Bank of India v. Sapru* (*In re Sapru*), 127 B.R. 306, 314 (Bankr. E.D.N.Y. 1991).  The bankruptcy petition and schedules of a debtor are considered statements under oath, *Gabor*, 2009 WL 3233907, at *7; *Gannon*, 173 B.R. at 320, and both omissions and affirmative misstatements can constitute false statements under § 727(a)(4)(A).  *Gabor*, 2009 WL 3233907, at *7; *Forrest v. Bressler* (*In re Bressler*), 387 B.R. 446, 460 (Bankr. S.D.N.Y. 2008).  Testimony at a section 341 meeting also qualifies as a statement under oath for purposes of § 727(a)(4)(A).  *Moreo*, 437 B.R. at 61.

Materiality is defined broadly.  A statement is material if it bears on the discovery of estate property or the debtor's business dealings.  *Gannon*, 173 B.R. at 319–20.  An omission may be material even if the asset is of questionable value.  *Premier Cap., LLC*

---

[8]   Section 727(4)(A) provides that the Court shall deny the debtor his general discharge if "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account."

v. Crawford (*In re Crawford*), 841 F.3d 1, 8-9 (1st Cir. 2016); *Palantine Nat'l Bank v. Olson* (*In re Olson*), 916 F.2d 481, 484 (8th Cir. 1990); *see In re Robinson*, 506 F.2d 1184, 1188 (2d Cir. 1974) ("Materiality does not require a showing that the creditors were prejudiced by the false statement.")  In determining fraudulent intent, the court can consider, among other factors, the debtor's level of sophistication.  *Rossi v. Moreo* (*In re Moreo*), Adv. Proc. No. 07-8256-478, 2009 WL 2929949, at *8 (Bankr. E.D.N.Y. Sept. 10, 2009), *aff'd*, 437 B.R. 40 (E.D.N.Y. 2010).  Furthermore, reckless indifference to or disregard of the truth is the equivalent of fraud for the purposes of § 727.  *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998) (Posner, J.); *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1583 n.4 (2d Cir. 1983); *see also Diorio v. Kreisler-Borg Constr. Co.*, 407 F.2d 1330, 1331 (2d Cir. 1969) ("Successful administration of the Bankruptcy Act hangs heavily on the veracity of statements made by the bankrupt . . . .  [R]eckless indifference to the truth . . . is the equivalent of fraud.").

Borges contends Placeres made a false statement or omission under oath when he failed to list his $900,000 malpractice claim against Robinson, and possibly Torres, and then offered incredible explanations at his § 341 meeting in an effort to justify the omission.[9]  Placeres contends that he did not believe he had a malpractice claim even after he became aware that his trial counsel had made the mistake that led to the pain and suffering award.  (*Defendant's PFF* at ¶ 49.)

---

[9]      Borges also charges that Placeres lied at his 341 meeting when he testified that the Disciplinary Committee had absolved him of wrongdoing.  (*Plaintiff's PFF* at 38.)  In fact, the Disciplinary Committee had issued an admonition based on Placeres' failure to appear at the February Hearing and for providing incomplete and inaccurate documents to the Disciplinary Committee.  (PX 23.)  Placeres' misstatement, however, was not material to his financial condition.

The evidence demonstrates that Placeres knowingly omitted the malpractice claim to protect his long-time friend Torres, who did not actually try the case but served as Placeres' attorney of record at all relevant times.  After the jury rendered a $900,000 award for pain and suffering, Placeres argued on appeal that damages for pain and suffering could not be recovered in a legal malpractice action.  That argument was rejected because Placeres failed to object at trial to the introduction of pain and suffering evidence or the related jury charge and verdict sheet.  Placeres understood when Torres and he were preparing his appeal that his trial attorney had made a mistake by failing to object.  (Tr. at 93:22-94:10; *see* 91:5-12.)  Furthermore, he was aware when he filed his bankruptcy petition that but for his trial counsel's error, Borges would not have recovered $900,000 for pain and suffering.  (Tr. at 95:17-20.)  Despite his knowledge, he did not list the malpractice claim as an asset on Schedule "B" where he was required to list his personal property, and when questioned at his § 341 meeting under oath, he told his chapter 7 trustee that he did not have any reason to sue anyone for malpractice.  (PX 24, at 12:4-7.)  Placeres did not amend his schedules until March 24, 2016, (Schedule "A/B" (ECF Main Case Doc. # 35), one year after the petition date and the same day that his chapter 7 trustee abandoned the malpractice claim to Placeres.[10]  (*Order Directing Abandonment of Property*, dated Mar. 24, 2016 (ECF Main Case Doc. # 36).)

---

[10]    Ironically, once the trustee abandoned the malpractice claim it was no longer property of the estate, *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 123 (2d Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 1213 (2009), or material to the case, and did not have to be scheduled by Placeres.

At trial, Placeres continued to adhere to the position that he did not know he had a malpractice claim until 2016. He gave the following testimony referring to his § 341 meeting testimony:

> Q    And when you were deposed by the trustee, you told him that you had no claim for malpractice against anybody.
>
> A    They asked me if I had any claims; I said no. I didn't know I had a legal malpractice claim against anyone at that time. I thought they meant like accident cases or things like that. It never came to mind that I had a malpractice claim.
>
> Q    And the trustee asked you if you had any reason to sue anybody for malpractice, and you said no.
>
> A    I didn't believe at that time that I did have a case against someone.

(Tr. at 90:7-16.)

His avowed ignorance of a malpractice claim was not credible. The omission of the malpractice claim from his schedules as well as his testimony at trial regarding the reason for that omission was false and Placeres knew it. He knew by the time he filed his bankruptcy case that his trial attorney had made a serious mistake that resulted in a $900,000 pain in suffering award. Placeres is an attorney who has been practicing law since 1976. Given his relative legal sophistication, it defies belief for him to say that he didn't know he had a legal malpractice claim, or that he honestly thought that any reference to malpractice or claims at his section 341 meeting referred only to medical malpractice or personal injury.

It became clear at trial that Placeres omitted any reference to a malpractice claim in his schedules and at his § 341 meeting to protect Torres. Placeres and Torres had been friends since they had attended high school and college together. (Tr. at 60:20-24.) Torres represented Placeres throughout for free. (Tr. at 60:25-61:3.) Torres was

28

unable to conduct the trial for personal health reasons, and Placeres retained Brian

Robinson to serve as trial counsel.  (Tr. at 70:20-71:5.)  Nevertheless, Torres remained

the attorney of record, (*see* PX 17), Robinson was never formally substituted, and Torres

handled the appeals.  Most telling, at one point after the trustee had abandoned the

malpractice claim, Borges offered to dismiss the adversary proceeding if Placeres would

assign the claim to him.  Placeres refused because Torres was his friend since high

school, he represented Placeres for free, Torres did not represent him at trial and he was

not going to throw Torres "under the bus."  (Tr. at 97:22-98:18.)

The malpractice claim was potentially the largest estate asset.  It was not up to

Placeres to decide the strength of the malpractice claim, or conclude that it was not

worth listing.  Although the claim against Robinson may have been time-barred, Torres

represented Placeres continuously virtually up until the petition date, and any potential

malpractice claim against Torres was not time-barred on the petition date.  While

Placeres continues to argue that Torres did not try the case and implies that he could not

be liable for Robinson's mistakes, the decision whether to pursue the claim was the

trustee's call.  Placeres' failure to disclose the malpractice claim assumed the trustee's

role of deciding what information was important and undercut the trustee's ability to do

his job.  *Bressler*, 387 B.R. at 465; *see O'Connell v. DeMartino* (*In re DeMartino*), 448

B.R. 122, 130 (Bankr. E.D.N.Y. 2011) ("It is not for a debtor to determine whether called

for information is immaterial, unimportant or of no benefit to creditors.")  Finally, the

fact that the trustee filed a no-asset report and abandoned the claim on motion by

Borges is immaterial.  *See Lincoln Savs. Bank v. Freese* (*In re Freese*), 460 B.R. 733,

739 (B.A.P. 8th Cir. 2011) ("[E]ven if discovery of the Debtor's property interests results

in no recovery for his estate, the omissions here were directly related to the Debtor's business and his assets, defining them as material for the purposes of § 727(a)(4)(A).")

The Court concludes that the Trustee has sustained his burden of proving that Placeres knowingly failed to disclose the malpractice claim, a material asset, in his schedules and during his sworn testimony at his § 341 meeting.  Accordingly, his discharge must be denied under 11 U.S.C. § 727(a)(4)(A).

The Clerk of the Court is respectfully directed to enter a judgment denying the debtor a discharge pursuant to 11 U.S.C. § 727(a)(4)(A).

Dated:  New York, New York,
          December 5, 2017

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge